[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-12769

_____

D. C. Docket No. 1:09-cv-21597-EGT

KERNEL RECORDS OY,

Plaintiff-Appellant,

versus

TIMOTHY MOSLEY,
f.k.a. Timbaland,
UMG RECORDINGS, INC.,
INTERSCOPE-GEFFEN-A&M,
d.b.a. Interscope,
d.b.a. Geffen,
MOSLEY MUSIC GROUP, LLC,
UNIVERSAL MUSIC DISTRIBUTION, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 14, 2012)

Before MARCUS and BLACK, Circuit Judges, and HODGES,[*] District Judge.

BLACK, Circuit Judge:

_____

[*]Honorable Wm. Terrell Hodges, United States District Judge for the Middle District of
Florida, sitting by designation.

Appellant Kernel Records Oy (Kernel) appeals the district court's[1] order granting Defendants' motion for summary judgment, and denying as moot Kernel's motion for summary judgment. We conclude the district court erred by granting Appellee Timothy Mosley's motion for summary judgment. However, because Kernel failed to produce substantially probative evidence that it complied with statutory prerequisites prior to filing this action, we affirm.

## I. FACTS

In the summer of 2002, Glenn Rune Gallefoss created a Sound Interface Device (SID) file called *Acidjazzed Evening.*[2] Gallefoss based his musical work on a MOD file that had been previously created by Janne Suni. Suni's MOD file is playable on an Amiga computer or by using a newer computer running software that "emulates" the Amiga and its sounds. Gallefoss's SID file is playable on a Commodore 64 computer or with "emulator" software. The technical details of both the SID and MOD files are irrelevant to this opinion; all that is relevant is

---

[1] The parties consented to proceeding before a magistrate judge in accordance with 28 U.S.C. § 636(c). For simplicity, we refer to the magistrate judge's decisions as those of the district court.

[2] Gallefoss's amended complaint indicates that his work is referred to by multiple titles, including *Acidjazzed Evening*, *Acid Jazzed Evening*, and *Acid Jazz*. For consistency, we use *Acidjazzed Evening* throughout this opinion.

2

that during the summer of 2002, Suni's existing MOD file was modified by Gallefoss into a SID file called *Acidjazzed Evening*.

On August 10, 2002, with Gallefoss's permission, *Acidjazzed Evening* appeared in the Australian disk magazine *Vandalism News* Issue #39.  The parties disagree as to how this "disk magazine" was published.  Kernel contends the disk magazine was published in August 2002 on a physical computer disk in Australia.  Defendants contend the disk magazine was published in August 2002 "on the Internet."  However published in August 2002, the parties agree that in December 2002, a Swedish website called *High Voltage SID Collection* uploaded[3] *Acidjazzed Evening* to its own website, likely after obtaining a copy from *Vandalism News* Issue #39.

On June 7, 2006, the allegedly infringing song *Do It* was released.  On August 16, 2007, Gallefoss transferred his rights in *Acidjazzed Evening* to Kernel.  Kernel litigated a claim of copyright infringement in Finland against parties associated with the release of *Do It*.  Kernel lost.  Kernel then brought its copyright infringement claim to the United States.

---

[3] "To download means to receive information, typically a file, from another computer to yours via your modem.  The opposite term is upload, which means to send a file to another computer." *United States v. Mohrbacher*, 182 F.3d 1041, 1048 (9th Cir. 1999) (quotation and alteration omitted).

## II. PROCEDURAL HISTORY

Kernel filed this action in the United States District Court for the Southern District of Florida.  Kernel's amended complaint alleged that defendants Timothy Z. Mosley, Mosley Music, LLC (Mosley Music), Universal Music Distribution Corp. (Universal), Nelly Furtado, UMG Recordings, Inc. (UMG), Interscope-Geffen-A&M (Interscope), EMI Music Publishing (EMI Publishing), EMI April Music, Inc. (EMI April), Virginia Beach Music (Virginia), WB Music Corp. (WB), and Warner Chappell Music, Inc. (Warner) (collectively, Defendants)[4] infringed its copyright of *Acidjazzed Evening*.  In the amended complaint, Kernel claimed *Acidjazzed Evening* was "first published outside the United States" and that  "[c]opyright registration in the United States [was] not required as a prerequisite to bringing an infringement action as the sound recording and musical

---

[4] Kernel also named Nelstar Publishing, Inc. (Nelstar) as a defendant in the action. Nelstar filed a motion to dismiss the complaint, claiming the court lacked personal jurisdiction over it, and that it was an indispensable party to the litigation.  After a hearing, the district court granted in part Nelstar's motion, finding a lack of personal jurisdiction.  However, the district court only dismissed Kernel's request for a permanent injunction, finding that Nelstar was not an indispensable party to the other counts of the amended complaint.
    Kernel claims in its opening brief that the district court erred by finding Nelstar was an indispensable party for the purposes of granting a permanent injunction.  However, "[d]ue to word limitations, Kernel . . . only briefly mention[ed] this point" in its brief, and incorporated its arguments to the district court by citation.  Appellant's Br. at 55.  Such a blatant attempt to "bypass the rules" only "makes a mockery of our rules governing page limitations and length." *See Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1167 n.4 (11th Cir. 2004).  Kernel waived this argument by not properly presenting it for review. *Id.*

4

arrangement at issue is not a 'United States Work,' as defined in 17 U.S.C. § 101."
Am. Compl. at 1-2.

Defendants individually answered the complaint and pleaded affirmative defenses. Each defendant raised as an affirmative defense Kernel's failure to comply with the required statutory formalities prior to filing suit, including registration of the allegedly protected work with the Copyright Office.

On May 28, 2010, Mosley and Mosley Music (collectively Mosley) moved for summary judgment. Contemporaneously with the motion for summary judgment, Mosley filed a statement of material facts, which alleged the following was undisputed:

> 2.     Gallefoss's work was first published on the Internet. "The first publication of Gallefoss's version of 'Acidjazzed Evening,' in any form, was in Australia as part of the disk magazine Vandalism News, issue 39, in August, 2002." (Amended Complaint, ¶ 25).
>
> 3.     Gallefoss chose the Internet as the means to first publish his work (as is customary in the "demoscene" sub-culture of which he is a member). (Gallefoss Depo., 2/11/10, 20-21). Exhibit A.
>
> 4.     The work at issue was not only "displayed" but was made available on more than one website for download, copying and for preparing derivative works  by others. (Gallefoss Depo. 2/11/10, 73-80). Exhibit A.

In his motion, Mosley contended that Kernel lacked the statutorily required copyright registration for *Acidjazzed Evening*, and the copyright infringement

action had to be dismissed.  Mosley claimed it was undisputed that *Acidjazzed Evening* "was first published on the Internet" as part of the disk magazine *Vandalism News* Issue #39.  Mosley contended that by making *Acidjazzed Evening* available to download from an "Internet site," Gallefoss simultaneously published his work in every country in the world with Internet service.  Mosley claimed such worldwide and simultaneous publication made *Acidjazzed Evening* a United States work subject to registration, and that Kernel's failure to register doomed its infringement claim.[5]

Mosley also attempted to preempt Kernel's response.  Mosley predicted Kernel would contend that because the Internet site was "based" in Australia, *Acidjazzed Evening* was published in Australia, and registration therefore was not required.  Mosley called this argument "unavailing, and at odds with the plain

---

[5]  Mosley also contended that Gallefoss failed to obtain permission from Suni to copyright his new version of *Acidjazzed Evening*, and that all defendants possessed an implied license to use Gallefoss's version of *Acidjazzed Evening*.  In a separate motion for summary judgment, Interscope, UMG, Universal, WB, and Warner argued that Gallefoss's work failed to be sufficiently distinct from Suni's work to warrant derivative work protection, and that Gallefoss's work was not a sound recording.  In a motion to dismiss, Furtado argued Kernel failed to state a claim against her upon which relief could be granted.  In granting summary judgment to Defendants, the district court did not address these arguments.  In their briefs on appeal, Defendants argue that we should rely on one of these grounds as an alternative rationale to affirm the grant of summary judgment.  We decline to exercise our discretion to consider these alternative grounds.  *See Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1306 n.15 (11th Cir. 2010).

6

language of . . . the Copyright Act." Mosley, however, misconceived Kernel's argument.

On May 28, 2010, Kernel also filed its motion for summary judgment and statement of material facts. In its motion, Kernel simply stated it need not have registered its work because *Acidjazzed Evening* was first published outside the United States. Kernel did not contend, as Mosley had anticipated, that *Acidjazzed Evening* was first published on the Internet in Australia. Instead, Kernel claimed as an undisputed fact that *Acidjazzed Evening* was published in Australia on a physical computer disk, and uploaded to the Internet months later. Kernel's statement of material facts stated that:

> 19.    Gallefoss authorized publication of his arrangement and sound recording of "Acidjazzed Evening" in a magazine published on a computer disk in Australia called *Vandalism News*, issue [3]9, in August 2002. Gallefoss Decl. ¶ 23.
>
> 20.    In December 2002, Gallefoss's arrangement and sound recording of "Acidjazzed Evening" was included in the High Voltage SID Collection and uploaded to the internet. Gallefoss Decl. ¶ 25.

The Gallefoss Declaration, dated May 28, 2010, was filed simultaneously with the statement of material facts.

Thus, on May 28, 2010, Mosley contended it was undisputed that *Acidjazzed Evening* was first published by making the SID file available for

7

download from an "Internet site."  On the same day, May 28, 2010, Kernel contended it was undisputed that *Acidjazzed Evening* was first published on a physical computer disk, and not uploaded to the Internet until months later.

Kernel subsequently responded in opposition to Mosley's motion for summary judgment.  Kernel objected to Mosley's statement of undisputed facts, contending "[t]he factual citation made by defendants makes no reference to first publication on the internet."  In its response, Kernel argued that *Acidjazzed Evening* was first published "on a disk magazine that was not online," and stated that Mosley's assertion to the contrary was "[w]ithout any foundation."  Pl.'s Resp. at 3.  Kernel also made the alternative argument that "[e]ven if the first publication of [*Acidjazzed Evening*] were online, it [was] not a U.S. Work subject to registration requirements."  Pl.'s Resp. at 5.

Defendants filed a collective response to Kernel's motion for summary judgment.  Defendants reiterated Mosley's argument that the facts were undisputed that publication occurred on the Internet and stated that Kernel's "failure to address its non-compliance with [the registration] statutory condition precedent mandate[d] the denial of [Kernel]'s summary judgment motion (and the granting of Defendants' motions)."  Defs.' Resp. at 4.

8

Mosley filed a reply in support of his motion for summary judgment.

Mosley argued that:

> [T]here ha[d] been no showing made of any mode or manner of publication *other than* via the Internet, nothing to support Plaintiff's effort to come within an exception to the Copyright Act's registration requirement, and nothing to show Plaintiff's compliance with the condition precedent to suit . . . The burden [wa]s on the Plaintiff to plead and prove its work is of foreign . . . origin and that, therefore, it [wa]s exempt from registration requirements. . . . Not only has Plaintiff not met its burden, Plaintiff's sudden efforts to contradict that the work was first published via the Internet d[id] not alter the undisputed record of an online publication . . . .

Mosley's Reply at 1-2. Mosley then argued that Kernel failed to produce a physical copy of the claimed computer disk and that it had only produced a webpage printout. Mosley also argued that Gallefoss "agreed that the publication was via the online magazine" in his deposition. *Id.* at 3. Finally, Mosley argued that Gallefoss's declaration should be disregarded because it was offered for the sole purpose of opposing the summary judgment motion, and contradicted his prior sworn deposition testimony. *Id.* at 5.

On March 31, 2011, the district court issued an "abbreviated non-final Order" intended to be "supplemented with a plenary memorandum opinion and a final appealable Order." The non-final order indicated that the court would grant

9

summary judgment to the defendants by relying on Mosley's Internet publication argument.

On April 1, 2011, Kernel filed a motion for reconsideration and a motion to stay the proceedings. Kernel claimed it had submitted credible evidence of non-Internet publication, but nevertheless voiced a willingness to register the work with the Copyright Office should the court hold the proceedings in abeyance. All defendants responded in opposition to Kernel's motions.

On May 5, 2011, Kernel filed a reply in support of its motion for reconsideration, indicating it had registered *Acidjazzed Evening*. Kernel also filed a motion for leave to amend its complaint to add the fact of its registration, attaching a certificate of registration from the Copyright Office effective April 29, 2011.

On June 7, 2011, the district court issued its final order. The district court found Gallefoss's deposition testimony was "clear enough" to affirmatively establish "Internet publication," and stated that if the testimony was "inaccurate or unclear, it was incumbent upon Plaintiff's counsel to clarify the witness' testimony on this important point." D. Ct. Final Order at 9. Relying on the sham affidavit doctrine, the district court disregarded Gallefoss's declaration, stating the "deposition testimony was clear" and a declaration cannot be used to create a

10

factual dispute when "a party has given clear answers to unambiguous questions."

*Id.* at 10-11.[6]  The district court also concluded that "[t]here can be little dispute

that posting material on the Internet makes it available at the same time –

simultaneously – to anyone with access to the Internet."  *Id.* at 19.  With these two

conclusions (i.e., *Acidjazzed Evening* was published on the Internet, and Internet

publication is de facto simultaneous, worldwide publication), the district court

proceeded to examine the ramifications under the Copyright Act's registration

requirement.  The district court determined that the unambiguous statutory

language of the Copyright Act dictates that a work simultaneously published in

every country of the world should be treated as a "United States work," and

subject to the Copyright Act's registration requirement.  Thus, because *Acidjazzed*

*Evening* was published on the Internet, it was (1) published simultaneously

worldwide; (2) a United States work; and (3) subject to the registration

requirement.  The district court concluded that Kernel's failure to register

---

[6] A district court may disregard an affidavit as a sham when a party to the suit files an affidavit that contradicts, without explanation, prior deposition testimony on a material fact.  *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).  The sham affidavit rule should be applied sparingly, *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010), and only when "[t]he earlier deposition testimony . . . consist[s] of clear answers to unambiguous questions which negate the existence of any genuine issue of material fact," *Lane v. Celotex Corp.*, 782 F.2d 1526, 1532 (11th Cir. 1986) (quotations omitted).  Because we affirm the grant of summary judgment while considering Gallefoss's alleged "sham" declaration, we need not determine whether the district court erred by relying on the sham affidavit doctrine.

11

*Acidjazzed Evening* prior to filing suit doomed its infringement claim.  The district

court then rejected Kernel's motions for reconsideration and for leave to amend

the complaint.  The district court found that Kernel had made a "calculated

decision" not to seek registration, and that its tardy efforts to "hedge its bet"

prevented a finding of good cause under Fed. R. Civ. P. 16 sufficient to allow an

amendment of the complaint.  Kernel filed a timely notice of appeal.[7]

## III.  SUMMARY JUDGMENT STANDARD

This Court reviews a district court's grant of summary judgment de novo.

*Brown v. Sec'y of State of Fla.*, 668 F.3d 1271, 1274 (11th Cir. 2012).  "The court

shall grant summary judgment if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  A genuine factual dispute exists only if a reasonable fact-

finder "could find by a preponderance of the evidence that the plaintiff is entitled

to a verdict."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  "Once

the movant adequately supports its motion, the burden shifts to the nonmoving

party to show that specific facts exist that raise a genuine issue for trial."  *Dietz v.*

---

[7] In addition to challenging the entry of summary judgment, Kernel claims on appeal that the district court abused its discretion by refusing to allow Kernel to amend its complaint.  This claim lacks merit.  *See Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1231-32 (11th Cir. 2008) (affirming district court's denial of plaintiff's motion to amend complaint after belated copyright registration).

*Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010).  However, when

the moving party fails to demonstrate the absence of a genuine issue of material

fact, the motion should be denied.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144,

160 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606-08 (11th Cir. 1991).

"Although all justifiable inferences are to be drawn in favor of the

nonmoving party," *Baldwin County v. Purcell Corp.*, 971 F.2d 1558, 1563-64

(11th Cir. 1992) (quotation omitted), "inferences based upon speculation are not

reasonable," *Marshall v. City of Cape Coral*, 797 F.2d 1555, 1559 (11th Cir.

1986).  Evidence that is "merely colorable, or is not significantly probative" of a

disputed fact cannot satisfy a party's burden, *see Anderson*, 477 U.S. at 249-50

(citation omitted), and a mere scintilla of evidence is likewise insufficient, *see*

*Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004).

## IV. COPYRIGHT LAW

The Constitution authorizes federal regulation of copyright protection.  U.S.

Const. art. I, § 8, cl. 8.  Congress overhauled federal copyright law by passing the

Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat. 2541 (codified at 17 U.S.C.

§ 101 et seq.).  As part of that overhaul, Congress eliminated all statutory

prerequisites to obtaining copyright protection.  Instead, Congress provided "that a

copyright exists the moment an original idea leaves the mind and finds expression

13

in a tangible medium, be it words on a page, images on a screen, or paint on a canvas[].” *La Resolana Architects, PA v. Clay Realtors Angel Fire*, 416 F.3d 1195, 1198 (10th Cir. 2005), *abrogated in part by Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237 (2010).

*A. Registration*

Congress also created a new voluntary registration system. *See* 17 U.S.C. § 408(a) (“[R]egistration is not a condition of copyright protection.”). Registration under the Copyright Act is relatively simple and inexpensive. A copyright owner who wishes to register must: (1) complete an application, *id.* § 409; (2) deposit with the Copyright Office a copy of the work to be copyrighted, *id.* § 408(b); and (3) pay a modest fee, *id.* § 708; 37 C.F.R. § 201.3(c) (listing fees ranging from $35 for a “basic claim” to $220 for a “claim in a vessel hull”). The Register of Copyrights examines the application and determines whether the deposited material is copyrightable, and if so, registers it. 17 U.S.C. § 410(a). Registration of a work may be obtained at any time during the subsistence of the work’s copyright. *Id.* § 408(a).

“[R]egistration is not a condition of copyright protection,” and is completely voluntary. *Id.* However, Congress created a substantial incentive for copyright owners to register United States works:

14

> [N]o civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title. In any case, however, where the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form and registration has been refused, the applicant is entitled to institute a civil action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights.

*Id.* § 411(a).  Thus, although "registration is not a condition of copyright protection," *see id.* § 408(a), registration (or a refusal of registration) of a United States work "is a prerequisite for bringing an action for copyright infringement," *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1142 (11th Cir. 2007). The plaintiff bears the burden of proving compliance with statutory formalities. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1233 (11th Cir. 2010).

Courts have divided on whether the filing of an application for registration with the Copyright Office is sufficient to comply with the statutory prerequisite, or whether a certificate of registration (or formal refusal) must be issued prior to suit. *See Nimmer on Copyright* § 7.16[B][3] (discussing "application" and "registration" approaches to registration timing problems).[8]  However, "[a]s an

---

[8] We adopted the "registration" approach in *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1488-89 (11th Cir. 1990), viewing the failure to register as a jurisdictional defect. In *Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1246-49 (2010), the Supreme Court held that the registration requirement is not jurisdictional, but rather a claims-processing rule similar to a statute of limitations or notice provision.  We need not revisit *M.G.B. Homes, Inc.* today.

In *Reed Elsevier, Inc.*, the Court reserved the question of whether district courts may or should enforce the registration prerequisite sua sponte.  *Id.* at 1249.  We do the same, since

15

absolute limit, if the Copyright Office has failed to receive the necessary elements

to issue a registration certificate [for a United States work] prior to the time that

the court is called upon to issue final judgment, the action must be dismissed."

*Nimmer on Copyright* § 7.16[B][3][c].  "Given the lax standards involved . . . that

requirement will never thwart a determined plaintiff."  *Id.*  Kernel, despite being a

determined plaintiff, nevertheless failed to apply for registration prior to calling on

the district court to issue final judgment.  Thus, Kernel's infringement claim could

survive only if *Acidjazzed Evening* is not a United States work, that is, if

*Acidjazzed Evening* is a foreign work exempt from registration.

*B. United States or Foreign Work*

> For purposes of § 411, the Copyright Act defines a "United States work" as

a work that:

> > (1) in the case of a published work, the work is first published--
> >
> > > (A) in the United States;
> > >
> > > (B) simultaneously in the United States and another treaty party or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States;

---

Mosley raised the issue of registration by motion.

16

(C) simultaneously in the United States and a foreign nation that is not a treaty party; or

(D) in a foreign nation that is not a treaty party, and all of the authors of the work are nationals, domiciliaries, or habitual residents of, or in the case of an audiovisual work legal entities with headquarters in, the United States;

(2) in the case of an unpublished work, all the authors of the work are nationals, domiciliaries, or habitual residents of the United States, or, in the case of an unpublished audiovisual work, all the authors are legal entities with headquarters in the United States; or

(3) in the case of a pictorial, graphic, or sculptural work incorporated in a building or structure, the building or structure is located in the United States.

17 U.S.C. § 101. A "treaty party" is defined as "a country or intergovernmental organization other than the United States that is a party to an international agreement." *Id.*

Although registration of "foreign works" (i.e., non-United States works) is not statutorily required, foreign works can also be registered. *See Nimmer on Copyright* § 7.16[C][1][a][iv]. Owners of foreign works may choose to apply for registration because Congress has granted substantial litigation benefits to owners of registered works. *Id.* A certificate of registration serves as prima facie evidence of copyright validity. 17 U.S.C. § 410(c). Further, only owners of

17

registered works may collect statutory damages and attorney's fees. *Id.* §§ 412,

504, 505. Because the fee for a basic registration is only $35, *see* 37 C.F.R.

§ 201.3(c)(1), these benefits far outweigh the costs of registration.

Here, the parties agree that *Acidjazzed Evening* was published, but dispute

whether *Acidjazzed Evening* is a United States work for which registration was

required prior to suit. Thus, their dispute and our analysis focuses on subsection 1

of the definition of a "United States work." Subsection 1's definition hinges on

the timing and locations of first publication. To determine where and when

*Acidjazzed Evening* was first published, we must examine the law of publication.

## C. Publication

"[P]ublication is a legal word of art, denoting a process much more esoteric

than is suggested by the lay definition of the term." *Estate of Martin Luther King,*

*Jr., Inc. v. CBS, Inc.*, 194 F.3d 1211, 1214 n.3 (11th Cir. 1999) (quotations

omitted). The Copyright Act defines "publication" as:

> the distribution of copies or phonorecords of a work to the public by sale
> or other transfer of ownership, or by rental, lease, or lending. The
> offering to distribute copies or phonorecords to a group of persons for
> purposes of further distribution, public performance, or public display,
> constitutes publication. A public performance or display of a work does
> not of itself constitute publication.

18

17 U.S.C. § 101.  Publication also occurs "when an authorized offer is made to dispose of the work in any such manner[,] even if a sale or other such disposition does not in fact occur."  *Brown v. Tabb*, 714 F.2d 1088, 1091 (11th Cir. 1983) (quoting *Nimmer on Copyright* § 4.04).[9]  Further, when copies are "given away" to the general public, a sufficient transfer of ownership has occurred.  *Id.*  Thus, proof of distribution or an offer of distribution is necessary to prove publication.[10]

However, proof of distribution or an offer to distribute, alone, is insufficient to prove publication.  Central to the determination of publication is the method, extent, and purpose of distribution.  *See Estate of Martin Luther King, Jr., Inc.*, 194 F.3d at 1214-1216 (discussing general and limited publication); *cf.* 17 U.S.C. § 101 (defining publication as distribution to the public).  Most publication disputes concern whether distribution of the subject work was sufficiently broad, or whether the purpose of the distribution included a transfer of the right of

---

[9] The statutory definition of publication "constitutes a codification of the definition evolved by case law before the 1976 [Copyright] Act."  *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 36 (1st Cir. 2003) (quotation omitted).  Thus, precedent examining publication under the 1909 Copyright Act is instructive.  *See Aerospace Servs. Int'l v. LPA Grp., Inc.*, 57 F.3d 1002, 1003 (11th Cir. 1995) (applying 1909 Copyright Act precedent to a 1976 Copyright Act claim); *Nimmer on Copyright* § 4.13[B].

[10] The Copyright Act does not define "distribution."  Therefore, the term should be given its plain and ordinary meaning.  *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*, 51 F.3d 235, 237 (11th Cir. 1995).  Black's Law Dictionary defines "distribute" as "[t]o deliver" or "[t]o spread out; to disperse."  Black's Law Dictionary 543 (9th ed. 2009); *see also* Oxford English Dictionary Online, http://www.oed.com (June 2012) (defining "distribute" as "[t]o deal out or bestow in portions" and "[t]o spread or disperse abroad").

19

diffusion, reproduction, distribution, or sale. *See Estate of Martin Luther King, Jr., Inc.*, 194 F.3d at 1215 (delivery of public speech via live broadcast to worldwide audience), 1216 (distribution to the press); *Aerospace Servs. Int'l v. LPA Grp., Inc.*, 57 F.3d 1002, 1003 & n.2 (11th Cir. 1995) (distribution to a general contractor and government agencies); *Donald Frederick Evans & Assocs., Inc. v. Cont'l Homes, Inc.*, 785 F.2d 897, 901 n.7 (11th Cir. 1986) (public display of a model home).

*D. Determining Whether First Publication Was Domestic or Foreign*

Determining whether a work was first published domestically or abroad adds an additional level of complexity. Because the statutory definition of "United States work" contains strict temporal and geographic requirements (e.g., "first," "simultaneously," "in the United States," "foreign nation," and "treaty party"), *see* 17 U.S.C. § 101, a determination that a work was first published abroad requires both: (1) an examination of the method, extent, and purpose of the alleged distribution to determine whether that distribution was sufficient for publication, and (2) an examination of both the timing and geographic extent of the first publication to determine whether the work was published abroad.

For example, a free pamphlet distributed by mail to every household on the continent of North America would undoubtedly meet the statutory definition of

20

"publication." *See* 17 U.S.C. § 101. However, to determine whether the very same pamphlet was first published abroad, the exact timing and geographic extent of the first publication must be known. Was the pamphlet first mailed to every household in Mexico, followed a week later by a separate mailing to the rest of the continent? If so, the pamphlet is a foreign work, first published abroad, and is not subject to the registration requirement.[11] Or was the pamphlet first mailed to households in the United States and Mexico, followed a week later by a separate mailing to the rest of the continent? If so, the pamphlet was first published in the United States and a treaty party whose law grants a term of copyright protection longer than the United States,[12] making the work a United States work that is subject to the registration requirement. *See* 17 U.S.C. §§ 101, 411(a). Without evidence of the exact timing and geographic extent of first publication, it would be impossible to determine whether the pamphlet met the statutory definition of a "United States work," or was instead a foreign work.

_____

[11] Mexico meets the statutory definition of a treaty party because Mexico is a party to multiple international agreements. *See* 17 U.S.C. § 101; United States Copyright Office, Circular 38A, *International Copyright Relations of the United States* 8 (2010), *available at* http://www.copyright.gov/circs/circ38a.pdf. Thus, 17 U.S.C. § 101(1)(D) is inapplicable.

[12] Mexican law provides for a copyright protection term of the life of the author plus 100 years. Ley Federal de Derechos de Autor [LFDA] [Authors' Rights Law], *as amended*, Artículo 29, Diario Oficial de la Federación [DO], 27 de Enero de 2012 (Mex.), *available at* http://www.diputados.gob.mx/LeyesBiblio/pdf/122.pdf. The United States provides for a copyright protection term of the life of the author plus 70 years. 17 U.S.C. § 302(a).

21

Of course, if a distribution is insufficient to establish publication, the timing and geographic extent of the deficient distribution is immaterial. Assume in both of the hypotheticals above that an advance copy of the pamphlet had been mailed only to a small number of reporters in Canada in an effort to gain media attention. Such a mailing to the press would not be a distribution to the public, and is therefore not a publication. *See Estate of Martin Luther King, Jr., Inc.*, 194 F.3d at 1216 (explaining that distribution to the news media, as opposed to the general public, for the purpose of enabling reporting is only a limited publication). Since the limited distribution to the press was not a publication, it could not be the first publication, and is immaterial to determining whether the pamphlet was a United States work or a foreign work.

Thus, to proceed with a copyright infringement action, a plaintiff that claims his published work is exempt from the registration requirement must prove that the first publication occurred abroad. *See* 17 U.S.C. §§ 101, 411(a); *Latimer*, 601 F.3d at 1233; *BUC Int'l Corp.*, 489 F.3d at 1141-42. This requires the plaintiff to first prove a publication: that the method, extent, and purpose of the distribution meets the Copyright Act's requirements for publication. Once the plaintiff has proven publication, he must then prove that the publication was, in fact, the first

22

publication, and that the geographic extent of this first publication diverges from the statutory definition of a "United States work."

## V. TECHNOLOGY REVIEW

Because terminology is important to our holding, we must review relevant technological terms. The term "online" means "relating to a service, resource, etc., available on or performed using a computer network (esp[ecially] the Internet)." Oxford English Dictionary Online, http://www.oed.com (June 2012). "The Internet is an international network of interconnected computers . . . . [that] enable[s] tens of millions of people to communicate with one another and to access vast amounts of information from around the world." *Reno v. ACLU*, 521 U.S. 844, 849-50 (1997). "Any person . . . with a computer connected to the Internet can 'publish' information. . . . Publishers may either make their material available to the entire pool of Internet users, or confine access to a selected group . . . ." *Id.* at 853.

The Internet consists "of a wide variety of communication and information retrieval methods. . . . [including] electronic mail (e-mail) . . . and the 'World Wide Web.'" *Id.* at 851. "E-mail enables an individual to send an electronic message . . . to another individual or to a group of addressees." *Id.* The sender of an e-mail may "attach" files such as photographs to the message. *See United*

23

*States v. Williams*, 553 U.S. 285, 305 (2008).  "[T]he World Wide Web . . . allows users to search for and retrieve information stored in remote computers . . . ." *Reno*, 521 U.S. at 852.  That information is typically presented to users as "web pages" or websites, most, but not all of which, are freely available to the public. *Id.*  In addition to e-mail and websites, Internet users may choose to distribute electronic files by other methods, such as "peer-to-peer networks." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 919-20 (2005). Internet users who desire access to peer-to-peer networks must download a software product that allows them to distribute and receive files over the Internet directly from other users of the software.  *Id.*  "[P]eer-to-peer networks are employed to store and distribute electronic files by universities, government agencies, corporations, and libraries, among others." *Id.* at 920.  Each of these very different "online" distribution methods occurs on the Internet.

Although "online" and "Internet" are largely synonymous terms, the Internet consists of distribution methods of significantly different types.  Thus, an "online" activity may occur through public websites, restricted websites, peer-to-peer networks, e-mail, or other less common methods.  Although it may be possible to presume simultaneous worldwide availability of a public website, *see ACLU v.*

24

*Reno*, 929 F. Supp. 824, 831, 836-37 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844 (1997),[13] such a presumption could not apply to restricted websites, peer-to-peer networks, and e-mail. A restricted website is only available to those willing to pay a fee or who meet specified criteria; a peer-to-peer network is only available to those who have downloaded the required software; and an e-mail only goes to the addresses input by the sender. Thus, unlike public websites on the World Wide Web, each of these other methods of online distribution would be inconsistent with a presumption of simultaneous worldwide availability.

To determine the countries to which these other online methods distribute material would require additional evidence, such as the country of residence of the users of a certain restricted website or peer-to-peer network, or the recipient of a certain e-mail. For example, if a restricted website has subscribers only in the United States, Germany, and Japan, placing a file on that website would not make the file simultaneously available to a worldwide audience. Similarly, if the software for a peer-to-peer network was downloaded only in Canada, Egypt, and the Netherlands, offering a file for download on the peer-to-peer network would

---

[13] As the Supreme Court observed in *Reno*, methods of communication on the Internet are "constantly evolving and difficult to categorize precisely." 521 U.S. at 851. The district court in *Reno* made extensive factual findings after holding extensive evidentiary hearings. *Id.* at 849; 929 F. Supp. at 828, 830-49. We therefore caution district courts against making presumptions such as this without careful consideration, especially without stipulations or supporting evidence.

25

not make the file simultaneously available to a worldwide audience.  Finally, if the recipients of an e-mail are all located in Mexico, sending a file by e-mail attachment would not make the file simultaneously available to a worldwide audience.  Each of these "online" distribution methods utilizes the Internet, but none of them can be presumed to result in simultaneous, worldwide distribution.

Throughout this case, the district court (as well as the parties) confounded "the Internet" and "online" with "World Wide Web" and "website."  Because of the strict temporal and geographic requirements contained in the statutory definition of "United States work," conflating these terms had a profound impact on the district court's evidentiary analysis.  By confounding "Internet" with "website," the district court erroneously assumed that all "Internet publication" must occur on the "World Wide Web" or a "website."  The district court then erroneously assumed all "Internet publication" results in simultaneous, worldwide distribution.  As outlined below, a proper separation of the terms yields a very different analysis.

## VI.  MOSLEY'S MOTION

Before the district court, Mosley claimed the evidence affirmatively established that Gallefoss, through *Vandalism News*, first offered *Acidjazzed Evening* to the public by "posting" it to an "Internet site" in August 2002.  Mosley

26

claimed that such a posting on the Internet amounted to a simultaneous, worldwide publication of *Acidjazzed Evening*, making *Acidjazzed Evening* a United States work, and requiring registration prior to suit.  Drawing all justifiable inferences in favor of Kernel as the nonmoving party, we conclude that Mosley failed to meet his burden as the movant under Rule 56 to show that there was no genuine dispute as to whether *Acidjazzed Evening* is a United States work.

In his motion for summary judgment, Mosley relied solely on Gallefoss's February 2010 deposition testimony:

Q: Now, you indicated that the first publication of your version of "Acid Jazz" was posted on this Australian –
A: Disk magazine.
Q: – online magazine, correct?
A: **Yeah**, that's the first – I gave it to the disk magazine, yes, so it was first used in that disk magazine.
Q: And then after that you posted it on this High Voltage site [a few months later]; is that correct?
A: I didn't post it. Someone else did.
Q: Who did that?
A: I don't know. Maybe the people who work for the High Voltage SID collection.
Q: And they may have just gained access to it from the online magazine?
A: **Yeah.**
Q: And then posted it themselves?
A: They took it from the disk magazines.

Gallefoss February 11, 2010 Deposition at 76:16-77:9 (emphasis added).

Mosley's characterization of the first "agreement" by Gallefoss that the disk

27

magazine was online is unavailing.  The transcript clearly indicates that Gallefoss interrupted his questioner immediately prior to the word "online."  This simultaneous questioning and answering, as indicated by the transcript, does not yield clear evidence.  The second purported "agreement" by Gallefoss is similarly problematic. Although the question assumes the disk magazine is online, the question's purpose was not to confirm this fact.  Instead, the questioner sought information about where "the people who work for the High Voltage SID collection" obtained their copy of *Acidjazzed Evening*.  Gallefoss confirmed "[t]hey took it from the disk magazines;" nothing more.  To infer from Gallefoss's answers that he acquiesced in the questioner's assumption of online publication requires a strained reading of the exchange and unreasonable speculation.

However, even that unreasonable speculation (if assumed to be reasonable), would not definitively prove that *Acidjazzed Evening* was made available to the public on a website.  As discussed, "online" is largely synonymous with the Internet, a term used to describe a wide variety of communication and information retrieval methods.  Because the term "online" does not foreclose Internet distribution methods other than via a public website, Gallefoss's supposed agreement as to *Vandalism News* being an "online magazine" does not support a finding of simultaneous, worldwide publication on a website.  Gallefoss's

28

ambiguous testimony is insufficiently probative to demonstrate that there was no dispute of material fact concerning how *Acidjazzed Evening* was first published. *See Clark*, 929 F.2d at 606-07; *cf. Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1343 (11th Cir. 2000).

Further, Gallefoss's May 2010 deposition testimony directly contradicts Mosley's characterization of the February 2010 deposition testimony quoted above. When asked specifically about websites, Gallefoss testified as follows:

> Q: Are there a number of websites that you're aware of that your SID file of 'Acid Jazz Evening' has appeared on?
> . . .
> A: I only know one.
> Q: Which one is that?
> A: The High Voltage SID collection.

Gallefoss May 7, 2010 Deposition Testimony at 93:11-15. When asked a direct, concise question about websites, Gallefoss gave a direct response. And a reasonable inference from that response is that *Vandalism News* Issue #39 did not appear on a website in August 2002.[14]

---

[14] It is important to remember that we are only concerned with where "the work is first published." 17 U.S.C. § 101. Although the parties disagree as to how the first publication occurred, they agree that the first publication appeared in the August 2002 release of *Vandalism News* Issue #39. Although the parties also agree that *Acidjazzed Evening* was placed on the *High Voltage SID Collection* website in December 2002, that fact is irrelevant to determining whether *Acidjazzed Evening* is a United States work.

Mosley's motion rested solely on Gallefoss's deposition testimony.

However, the district court cited two additional pieces of evidence to support its

finding that no genuine dispute of material fact existed as to how *Acidjazzed*

*Evening* was first published.  The district court first cited Suni's deposition

testimony.  At his deposition on May 26, 2010, Suni testified as follows:

> Q: Are you familiar with an Internet publication called Vandalism News?
> A: Yes.
> . . .
> Q: All right.  Now, this online magazine, what is the focus of that magazine?
> . . .
> A: Well, it's the demoscene.  It's history and publications and also displays interviews on people involved in the demoscene.

Suni May 26, 2010 Deposition at 3-4.

Suni's deposition testimony suffers from a lack of specificity in two ways.

First, although Suni testified as to his general familiarity with *Vandalism News*,

his testimony lacked temporal context.  Suni's general familiarity with *Vandalism*

*News* as an Internet publication on May 26, 2010, is too remote to be significantly

probative as to whether *Vandalism News* Issue #39 was an Internet publication in

August of 2002.  *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1195 (11th

Cir. 1999) (finding ten-year-old evidence "too remote and attenuated" to be

probative); 1 K. Broun, McCormick on Evidence § 185 at 732 (6th ed. 2006)

30

("[E]vidence lacking substantial probative value may be condemned as 'speculative' or 'remote.' . . . Remoteness relates not to the passage of time alone, but to the undermining of reasonable inferences due to the likelihood of supervening factors.").

Second, Suni, like Gallefoss, testified only that *Vandalism News* is an "Internet publication" and an "online magazine." Neither of these general characterizations provide any indication as to what method may have been used to distribute *Acidjazzed Evening* over the Internet in August 2002. Once again, the terms "Internet" and "online" include alternatives to the use of a public website, including a restricted website, e-mail, or a peer-to-peer network. Such general and ambiguous deposition testimony, without the inclusion of specific facts, is insufficiently probative to demonstrate that there was no dispute of material fact. *See Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000); *Wolf*, 200 F.3d at 1343.

The only other piece of evidence discussed by the district court related to publication is a document produced by Kernel during discovery. The document is a screen-shot from a third-party website called "Commodore 64 Scene Database," which seeks "to gather as much information and material about the scene around the commodore 64 computer . . . ." Visitors to the site "can find almost anything

31

which was ever made for the commodore 64."  The screen-shot was made on February 5, 2010, lists the publication as *Vandalism News #39*, lists the releasing party, lists a release date of "10 August 2002," and lists *Acid Jazz* as a SID included in the release.  This document, created eight years after the alleged first publication, is of minuscule probative value.  Although it may establish the existence of *Vandalism News* Issue #39 and the date of its first release (neither of which is disputed by either party), it provides no basis from which to reasonably infer <u>how</u> *Vandalism News* Issue #39 was first released, whether on a public website, through another Internet distribution method, or on a physical computer disk.

Mosley failed to meet his burden as the movant under Rule 56 to show that there was no genuine dispute as to whether *Acidjazzed Evening* was published on a public website.  Fed. R. Civ. P. 56(a).  Mosley's failure to meet his burden precludes the presumption of simultaneous, worldwide publication relied upon by the district court.  Because Mosley failed to meet his burden as the movant under Rule 56 to show a lack of genuine dispute as to whether *Acidjazzed Evening* is a United States work, the district court erred by granting Mosley's motion for summary judgment.  *See Adickes*, 398 U.S. at 157; *Clark*, 929 F.2d at 606-07.

32

## VII.  ALTERNATIVE GROUND

Although Mosley's motion was improperly granted, this Court may affirm the judgment of the district court on any ground supported by the record, regardless of whether that ground was relied upon or even considered by the district court.  *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010) ("This court may affirm a decision of the district court on any ground supported by the record."); *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("We may affirm the district court's judgment on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below.").[15]

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  A genuine factual dispute exists only if a reasonable fact-finder "could find by a preponderance of the evidence that the plaintiff is entitled to a verdict."  *Anderson*, 477 U.S. at 252.  Thus, when the record viewed in the light most favorable to the nonmovant reveals insufficient evidence to

---

[15] In *Thomas*, the district court had granted summary judgment on the grounds that a plaintiff failed to allege a sufficiently hostile work environment to support a Title VII claim.  506 F.3d at 1363.  This Court decided that it need not examine that question, because the Title VII plaintiff "failed to produce evidence from which a reasonable jury could find a causal connection" between her complaints and her termination.  *Id.* at 1364.

support a verdict for the nonmovant, summary judgment is appropriate. *Id.*; *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1356 (11th Cir. 2007); *Thomas*, 506 F.3d at 1363-64.

Here, a close review of the record dictates affirming the grant of summary judgment. Kernel bears the burden of proving compliance with statutory formalities, including the registration prerequisite. *See Latimer*, 601 F.3d at 1233; *BUC Int'l Corp*, 489 F.3d at 1142. Kernel failed to register *Acidjazzed Evening* prior to filing suit. The record reveals a lack of sufficiently probative evidence to determine that *Acidjazzed Evening* is a foreign work. Without sufficiently probative evidence of *Acidjazzed Evening* being a foreign work exempt from registration, and without a certificate of registration, Kernel's infringement suit was over before it began. *See* 17 U.S.C. § 411(a); *BUC Int'l Corp.*, 489 F.3d at 1142.[16]

---

[16] Kernel cannot persuasively claim any prejudice from our affirming summary judgment on a ground not expressly considered by the district court. *See Gerling Global Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1232 n.3 (11th Cir. 2001). Mosley's summary judgment motion put Kernel on notice that it had to come forward with all of its evidence on the issue of whether *Acidjazzed Evening* was a foreign work. *See Celotex Corp.*, 477 U.S. at 326; *Thomas*, 506 F.3d at 1364. Kernel had every opportunity to request further discovery before filing a motion for summary judgment, *see* Fed. R. Civ. P. 56(d), but chose instead to make its own motion for summary judgment using the evidence discussed below. The record evidence of publication and its adequacy was a central issue in the parties' summary judgment motion papers, in Kernel's motion for reconsideration, in each party's appellate brief, and at oral argument before this Court. Because Kernel had sufficient notice of the issue's import and had multiple opportunities to respond, we do not hesitate to affirm the entry of summary judgment on a ground supported by the record, even one independent of Mosley's motion. *See Krutzig*, 602

34

Kernel denied publication occurred by any means of Internet distribution.[17]

Instead, Kernel insisted "[t]he first publication [of *Acidjazzed Evening*] was on a

disk magazine that was not online."  In support of this theory, Kernel offered

Gallefoss's declaration and deposition.  Gallefoss's declaration stated:

> 23.    I authorized publication of my version of "Acidjazzed Evening"
> in a magazine published on a computer disk in Australia called
> *Vandalism News*, issue [3]9, in August 2002.
>
> 24.    *Vandalism News* is a magazine that appeals largely to people in
> the demoscene because the computer disk it is published. [sic]
>
> 25.    In December 2002, without my permission or objection, my
> arrangement and sound recording of "Acidjazzed Evening" was included
> in the High Voltage SID Collection and uploaded to the internet.

Gallefoss Declaration at 3.  Gallefoss's declaration, alone, is insufficient to

establish that *Acidjazzed Evening* is a foreign work; he fails to address

distribution, an essential element of publication.  Although Gallefoss baldly attests

that the disk magazine was published, "publication is a legal word of art, denoting

a process much more esoteric than is suggested by the lay definition of the term."

*Estate of Martin Luther King, Jr., Inc.*, 194 F.3d at 1214 n.3 (quotations omitted).

---

F.3d at 1234.

[17] In its reply brief, Kernel contends that *Acidjazzed Evening* was published when
Gallefoss offered to distribute *Acidjazzed Evening* to *Vandalism News* for further distribution to
members of the public.  Because Kernel raised this argument for the first time in its reply brief,
we treat the argument as waived.  *Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591
F.3d 1337, 1351 n.11 (11th Cir. 2009).

Gallefoss attests to the computer disk being "published . . . in Australia . . . in August 2002," but he fails to attest to whether the disk was ever distributed, the breadth of distribution, the purpose of the distribution, and whether the distribution included a transfer of the right of diffusion, reproduction, distribution, or sale. *See id.* at 1216. The unsupported, conclusory, and general attestation by Gallefoss that *Acidjazzed Evening* was "published" lacks probative value, and is insufficient to prevent a grant of summary judgment. *Leigh*, 212 F.3d at 1217 ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value." (quotation omitted)).

Kernel also offered Gallefoss's February 2010 deposition testimony as proof of publication by distribution on a physical disk. That exchange (and every other piece of evidence cited by Kernel to support its theory of publication by physical computer disk) fails to provide any insight as to distribution. Because Kernel failed to offer significantly probative evidence of distribution, that is, whether the disk was ever distributed, the breadth of distribution, the purpose of the distribution, and whether the distribution included a transfer of the right of diffusion, reproduction, distribution, or sale, no reasonable fact-finder could find that *Acidjazzed Evening* was first published on a physical computer disk in August 2002. *See Latimer*, 601 F.3d at 1233; *Welding Servs., Inc.*, 509 F.3d at 1356;

36

*Estate of Martin Luther King, Jr., Inc.*, 194 F.3d at 1216. Without a finding that publication occurred, no reasonable fact-finder could find the location of the August 2002 publication, whether in the United States or abroad. *See* 17 U.S.C. § 101 (defining "United States work").

Although no reasonable fact-finder could find by a preponderance of the evidence that Kernel's specific theory of publication occurred, that alone is insufficient to dispose of the case. If a reasonable fact-finder, under any theory, could find by a preponderance of the evidence (1) that *Acidjazzed Evening* was published; (2) when that first publication occurred; and (3) in what countries that first publication occurred, we would be required to remand the case to the district court. However, on this record, no reasonable fact-finder could possibly determine by a preponderance of the evidence those essential facts.

First, as previously discussed, Gallefoss's February deposition testimony and Suni's deposition testimony are too ambiguous and general to be sufficiently probative evidence of first publication. *Leigh*, 212 F.3d at 1217; *Wolf*, 200 F.3d at 1343. Second, the only inference (albeit an unreasonable and speculative one) to be drawn from Gallefoss's and Suni's ambiguous and general testimony is that *Acidjazzed Evening* was distributed "online" or on "the Internet." *See Marshall*, 797 F.2d at 1559 ("[I]nferences based upon speculation are not reasonable.").

37

Third, although the screen-shot corroborates that *Acidjazzed Evening* was first released in August 2002 as part of *Vandalism News* Issue #39, it provides no evidence of "Internet publication," and certainly not availability from a publicly accessible website.

We have exhaustively reviewed the record; not a single piece of documentary or testimonial evidence describes *Vandalism News* as a publicly accessible website, or provides a basis to infer that *Vandalism News* Issue #39 was uploaded to a publicly accessible website in August 2002. To the contrary, Gallefoss testified clearly that the only website on which *Acidjazzed Evening* appeared was the *High Voltage SID Collection*, beginning in December of 2002. We are, at best, left with simple speculation that *Acidjazzed Evening* was published on the Internet in August 2002. A reasonable fact-finder could not find that a simultaneous, worldwide publication occurred in August 2002. Because the record lacks sufficiently probative evidence of simultaneous worldwide publication, we need not determine what effect simultaneous worldwide publication would have under 17 U.S.C. § 101's definition of a United States work.

Kernel has failed to produce sufficiently probative evidence of *Acidjazzed Evening* being a foreign work exempt from registration. Without proof of

38

compliance with required statutory prerequisites, Kernel's case was not properly commenced. *See BUC Int'l Corp.*, 489 F.3d at 1142. We need not remand the case for the simple purpose of allowing Kernel a second chance to muster the necessary proof. Instead, we affirm the grant of summary judgment.

## VII.  CONCLUSION

Mosley failed to demonstrate the absence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 252. Because Mosley failed to meet his burden as the movant under Rule 56, the district court erred by granting Mosley's motion for summary judgment. *See Adickes*, 398 U.S. at 157; *Clark*, 929 F.2d at 606-07.

However, Kernel has failed to produce sufficiently probative evidence that it complied with the statutory prerequisites required to bring this action. We have reviewed all of the evidence cited by the parties and by the district court, and have independently reviewed the record. When all inferences are drawn from the evidence in favor of Kernel, the record lacks sufficiently probative evidence of whether *Acidjazzed Evening* is a United States work or a foreign work. Kernel bears the burden of proving compliance with statutory formalities. *Latimer*, 601 F.3d at 1233. Thus, because Kernel failed to apply for registration prior to the district court's grant of summary judgment, and Kernel cannot demonstrate that

*Acidjazzed Evening* is a foreign work exempt from registration, Kernel's case is

doomed.  *See* 17 U.S.C. § 411(a).  We affirm the grant of summary judgment.

   **AFFIRMED.**